1

2

3

4

5

6

7

8                         IN THE UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SERGEI PORTNOY,

11            Plaintiff,                      No. 2:11-cv-1720-GEB-EFB PS

12        vs.

13   CITY OF WOODLAND; DETECTIVE
     TOWLE #883; OFFICER CHAN #806;
14   OFFICER DROBISH #859.

15            Defendants.                     FINDINGS AND RECOMMENDATIONS

16   _____/

17        This action proceeds before the undersigned pursuant to Eastern District of California

18   Local Rule 302(c)(21) and 28 U.S.C. § 636(b)(1).  Defendants City of Woodland ("City" or

19   "City of Woodland"), Detective Richard Towle ("Detective Towle"), Officer Kent Chan

20   ("Officer Chan"), and Officer Jason Drobish ("Officer Drobish") (collectively, "defendants")

21   move for summary judgment and/or summary adjudication.  Dckt. No. 43.  A hearing on the

22   motion was held on December 19, 2012.  Attorney Jeri Lynn Pappone appeared at the hearing on

23   behalf of defendants; plaintiff appeared pro se.  For the reasons stated herein, the court

24   recommends that defendants' motion be granted in its entirety.

25   ////

26   ////

I.      BACKGROUND

On June 27, 2011, plaintiff filed this action against the City, Detective Towle, Officer Chan, and Officer Drobish, alleging causes of action for (1) violations of his Fifth Amendment and (2) Fourteenth Amendment rights, (3) violation of the Human Rights Act, (4) assault, (5) trespassing, (6) intentional infliction of emotional distress, and (7) negligent infliction of emotional distress related to his arrest for violation of California Penal Code section 476a on February 23, 2011.  Plaintiff seeks compensatory and punitive damages in the combined amount of $700,000.  Compl., Dckt. No. 1.

Defendants move for summary judgment, arguing that (1) plaintiff has not stated a claim against the City of Woodland in light of *Monell* and California Government Code section 815; (2) there is no valid "Human Rights Act" claim; (3) plaintiff's arrest without a warrant was legal and defendants had probable cause; (4) there was no unlawful seizure of plaintiff; (5) the officers are entitled to qualified immunity; (6) there is no valid claim against the officers for trespassing; (7) the officers did not conduct an impermissible search; (8) there are no allegations to support an assault claim against the officers; (9) plaintiff has no claim for violation of equal protection or due process; (10) plaintiff's does not have a claim for loss of familial association; and (11) plaintiff has not stated a claim for intentional or negligent infliction of emotional distress.[1]  Dckt. No. 43-1.  Plaintiff opposes the motion.  Dckt. Nos. 44, 45.

II.     FACTS

Based on the pleadings and evidence on file in this action, and except as otherwise specifically provided in this section, the court finds the following facts to be undisputed:[2]

////

---

[1] Defendants previously moved for summary judgment in June 2012, Dckt. No. 34, but that motion was denied without prejudice.  Dckt. No. 41.

[2] Plaintiff only disputes three facts contained in defendants' statement of undisputed facts: UMF 53, 59, and 88, each of which will be addressed herein.  Dckt. No. 45 at 2.

Simeon McKenzie is a law enforcement officer employed by the City of Woodland Police Department and was so employed in 2010 and 2011, during the time of the events referred to in this litigation.  Defs.' Undisputed Material Fact ("UMF") 1.[3]  On or about December 14, 2010, Officer McKenzie received a report of fraud from Donna Sutherland, the assistant branch manager of River City Bank in Woodland, California.  UMF 2.  Ms. Sutherland informed Officer McKenzie that a customer named Elena Portnoy had an active account with River City Bank.  UMF 3.  Ms. Portnoy was believed by bank personnel to be out of the United States and currently in the Country of Georgia (of the former Soviet Union).  UMF 4.  The bank was informed verbally by telephone from Ms. Portnoy that her husband, plaintiff Sergei Portnoy, was allowed to use her account.  UMF 5.

Ms. Sutherland informed Officer McKenzie that plaintiff had used Ms. Portnoy's bank account for some time and at times had cashed checks and overdrawn the account.  In the past, when the account was overdrawn, the bank would contact plaintiff and he would come into the bank and pay the negative balance in cash.  UMF 6.  Ms. Sutherland informed Officer McKenzie that on three recent occasions, November 22, 23, and 26, 2010, plaintiff deposited checks, each in the amount of $2000.00, into Ms. Portnoy's account via the ATM for a total deposit of $6000.00.  UMF 7.  The checks deposited were issued from an account at USAA Federal Savings Bank in the name of Karina Arutyunova, which listed the same address as plaintiff's address in Woodland, California.  UMF 8.  Ms. Sutherland informed Officer McKenzie that after plaintiff  deposited the three checks, he withdrew the $6000.00 from Ms. Portnoy's account. However, the three checks had been returned by USAA Federal Savings Bank for insufficient funds in Arutyunova's account.  UMF 9.  Attempts by River City Bank to contact plaintiff to return the $6000.00 were unsuccessful.  UMF 10.

////

---

[3] All citations to the UMF incorporate the evidence cited therein.

Officer McKenzie's subsequent investigations revealed that plaintiff had been arrested in 2006 on similar charges of bank forgery or fraud, but the charges were dismissed when the only witness in the case went back to Russia.  UMF 11.  In addition, Officer McKenzie's inquiries revealed that plaintiff currently lives at the address on both the USAA Federal Savings Bank checks and account records and the River City Bank checks and account records.  UMF 12.

Officer McKenzie obtained California Driver's License information, including signatures, on Karina Arutyunova, Elena Portnoy, and plaintiff.  UMF 13.  He also contacted USAA Federal Savings Bank regarding the account in the name of Karina Arutyunova, and was informed by an employee of the bank that the account was valid, but the bank would not disclose any further information.  UMF 14.

On January 7, 2011, Officer McKenzie returned to River City Bank and obtained legal copies of the checks at issue, an operating loss report, additional copies of the checks, and photographs of plaintiff at the ATM.  He booked the foregoing into evidence.  UMF 15.

On January 13, 2011, Officer McKenzie went to plaintiff's home and spoke with plaintiff, who confirmed his identity.  Plaintiff told Officer McKenzie that Elena Portnoy was his wife and that she was currently in the country of Georgia, having been deported from the United States.  UMF 16.  Plaintiff also identified Arutyunova as his ex-wife, with whom he has a seventeen year old son.  Plaintiff stated that he did not know where Arutyunova lived, nor did he know how to contact her.  He stated that Arutyunova kept her location private from him because she did not want him to see their son.  UMF 17.  He also reported that Arutyunova spoke broken English and he believed she could not write in English.  He stated that the signatures on the three checks were Arutyunova's.  UMF 18.  Plaintiff did not know why his address was on her checks and stated that the checks were sent to him by Arutyunova because she owed him money.  UMF 19.  However, at the same time, he told Officer McKenzie that he was paying child support to Arutyunova through a state agency.  He would not tell Officer McKenzie how much he was

////

4

1  paying in child support, nor why Arutyunova owed him money.  UMF 20.  Plaintiff told Officer

2  McKenzie that he had been unemployed since March of 2009.  UMF 21.

3        Officer McKenzie's attempts to locate Arutyunova and obtain a statement and writing

4  sample from her were unsuccessful.  UMF 22.  Officer McKenzie prepared a report which

5  included the documents obtained by him in his investigation.  Officer McKenzie then forwarded

6  the case to Investigations.  UMF 23.

7        Richard Towle is a detective employed by the City of Woodland Police Department and

8  was so employed in 2010 and 2011, during the time of the events referred to in this litigation.

9  UMF 24.  On or about January 27, 2011, Detective Towle was assigned the investigation from

10  Officer McKenzie regarding plaintiff, and the checks naming Ms. Portnoy and Arutyunova.  He

11  reviewed the case file from Officer McKenzie on about February 15, 2011, including the copies

12  of the checks in question.  UMF 25.  It appeared from the content of Officer McKenzie's reports

13  and the evidence compiled by Officer McKenzie that plaintiff owed Arutyunova money for child

14  support, that he had been fired from his job in March of 2009, and that he refused to provide a

15  reason for Arutyunova to be giving him $6000.00, contrary to the appearance of his debt to her.

16  UMF 26.

17        Detective Towle attempted to locate Arutyunova, including asking San Francisco Police

18  to check the most recent address he had found for her, but San Francisco Police were unable to

19  locate her at the address.  As of February 23, 2011, Detective Towle was unable to make any

20  contact with Arutyunova or discover where she was living.  UMF 27.

21        At 8:40 a.m. on February 23, 2011, with full knowledge of all the information contained

22  in the report and file previously prepared by Officer McKenzie, Detective Towle prepared a

23  Probable Cause Declaration for plaintiff's arrest.  UMF 28.  On February 23, 2011, at

24  approximately 10:54 a.m., Detective Towle then contacted Officer Drobish, who was a City law

25  enforcement officer on patrol at the time, and asked him to locate plaintiff and arrest him.  UMF

26  ////

29-31.  Officer Kent Chan was also on patrol at that time and was requested to assist Officer

Drobish in locating and arresting a plaintiff.  UMF 32-33.

At approximately 11:00 a.m. on February 23, 2011, Officers Drobish and Chan arrived at

plaintiff's residence and contacted him at the front door.  UMF 34.  The officers confirmed

plaintiff's identity and asked if they could talk to him.  UMF 35.  Plaintiff then invited both

officers into his home.  UMF 36.  Because they had plaintiff's permission, and for their safety

and so they would not lose sight of plaintiff as he moved from the front door further into the

house, the officers followed plaintiff into his residence and he proceeded to turn off his

computer.  UMF 37.  Officer Chan conducted a quick protective sweep of the residence to ensure

there were no other people present in the house that could potentially be a threat to the officers.

UMF 38.  No search of or for evidence, things, or plaintiff's belongings was done.  UMF 39.

Officer Drobish informed plaintiff that they were there to arrest him based upon probable cause

pertaining to fraud committed by him according to case #11-107.  UMF 40.  Plaintiff responded,

"OK, but you are making a big mistake."  UMF 41.  Officer Drobish detained plaintiff in

handcuffs and sat him down on his desk chair.  UMF 42.

Plaintiff informed the officers that he had a fifteen year old son and a five year old

daughter at school, with no one else to care for them.  UMF 43.  Officer Drobish informed

Detective Towle that he and Officer Chan had located plaintiff at his home and had him in

custody at that time.  Officer Drobish also informed Detective Towle that plaintiff had two minor

children who were in school at the time and there was no one to care for them when they were

out of school.  UMF 44.  Because the children had to be taken care of, Detective Towle went to

plaintiff's home to arrange for a family member to care for them, or to coordinate with Child

Protective Services ("CPS") for the care and custody of the children.  Detective Towle also knew

that if CPS needed to be called, the CPS worker would want to talk to the parent(s) of the

children that are being taken into custody.  UMF 45.  Officer Drobish informed Detective Towle

////

that while they were awaiting my arrival, plaintiff stated he wanted to talk to Detective Towle and was waiting to talk with him.  UMF 46.

While awaiting the arrival of Detective Towle, plaintiff continued to tell Officers Drobish and Chan that the police were making a big mistake and that he was going to sue them and the Department.  UMF 47.  Plaintiff spontaneously stated that he did deposit the subject checks into the bank account, but that it was not his problem that the bank gave him the money to withdraw.  UMF 48.  Plaintiff continued that this was a "civil issue and it will just get dismissed, so go ahead and arrest me; I'll just get more money from a lawsuit like last time."  UMF 49.  Plaintiff kept insisting on speaking with Detective Towle, and stating, it was okay, he would wait for Detective Towle.  UMF 50.

Detective Towle arrived at plaintiff's home at approximately 11:28 a.m.  When he arrived, he activated his digital recorder and entered the residence.  UMF 51.  Plaintiff was handcuffed in the living room of his residence in the presence of Officers Drobish and Chan.  UMF 52.  According to defendants, plaintiff did not tell Detective Towle not to enter his home, did not object to Detective Towle entering his home, and did not ask for Detective Towle to leave.  UMF 53.  However, plaintiff disputes that fact and contends that with regard to defendants' entry into his home, the following occurred:

4. One of the males asked me: ***"Are you Sergei Portnoy?"***.  I answered: ***"Yes"***, and asked: ***"What Do You Need?"***.  I was told: ***We Want To Ask You Some Questions"***.  I told to them: ***"OK, You Can Ask Right Now"***.  After this one of the males asked me: ***"Can We Enter The House?"***, I answered: ***"I Go Turn Off My Computer and You Can Come"***.

5. Factually, two males in police uniform had my voluntary consent:  <u>To Enter The House, To Ask Some Questions</u>, ***but I never gave to anybody, voluntary consent: To Enter The House, For Search and Arrest***.

***

15.  About half an hour later one more male without uniform, came into my residence without my permission.

16.  He started to walk and whisper with the other males all over my residence.

////

17.  I demanded to all of them, that they shall be every time in the living room before my eyes.

18.  Male without uniform came into living room and told me that I should prove that I am not guilty.  I answered that: "<u>First</u>, *I Didn't Need To Do Anything, For Anyone*; <u>Second</u>, *I Didn't Want To Talk With People Who Acted Like Gangster, and by Misrepresentation, Without Warrants Came Into My Residence, Handcuffed Me and Walked Around My Residence As If They Were The Owner*."

19.  For the second time I warned all three of them that their actions are illegal and demanded that they take off my handcuffs, and leave the house immediately.

Dckt. No. 44-1, Pl.'s Decl., at 2, 3, 4 (emphasis in original).

Plaintiff proceeded to answer Detective Towle's questions regarding the children.  UMF 54.  Officer Chan then left the scene since Detective Towle and Officer Drobish needed no further assistance from him.  UMF 55.

Detective Towle told plaintiff that he would make arrangements for someone to care for his children if he wished.  Plaintiff informed Detective Towle that he had no one available to care for his children.  UMF 56.  Detective Towle then informed plaintiff that he was going to have to take his children into protective custody.  UMF 57.  Detective Towle contacted Yolo County CPS and Ramiz Ali returned his call.  Mr. Ali informed Detective Towle that he would be responding to the location from Davis, and that he needed to interview the parent before the officers transported plaintiff to jail.  UMF 58.

According to defendants, Detective Towle advised plaintiff of his *Miranda* rights in the presence of Officer Drobish, and Detective Towle asked plaintiff if he understood his rights.  UMF 59.  However, plaintiff disputes this fact, citing to the following three paragraphs in his declaration:

3.  When I opened the door I saw through the screening door, two males in police uniform (without badges).  They were standing just outside of my residence at my screen door.

***

8.  Without any questions they grabbed me and handcuffed me against my will and ignored my protest.

***

10.  ***I demanded for them to present arrest and search warrants.***  One of the males answered: ***"We Are Woodland Police and We Do Not Need To Have Warrants Because Of Probable Cause"***, but no "Probable Cause" was presented. After this one of them read to me "Miranda Rights".

Pl.'s Decl. at 2, 3 (emphasis in original).

Plaintiff does not dispute, however, that he stated that he understood his rights and did not need a lawyer.  UMF 60.  Nor does he dispute that Detective Towle started asking plaintiff questions about the case, and plaintiff spoke freely and without hesitation.  UMF 61.  He very willingly told Detective Towle what he thought of the charges and the arrest.  UMF 62.  Plaintiff was also un-cooperative, continued challenging the officers to go ahead and take him to jail, and refused to disclose or produce any evidence that might support or prove his innocence of the charge of fraud.  UMF 63-77.

CPS arrived and spoke with plaintiff regarding the children.  UMF 78.  Prior to departing the home, it was the officers' responsibility to secure plaintiff's home.  When the officers asked plaintiff for the keys to lock the home, plaintiff stated that he did not want Detective Towle to lock up, but directed the CPS worker to lock up the home.  UMF 79.  Detective Towle advised plaintiff that it was not the CPS worker's responsibility to secure the residence, but that if he agreed to do so, he could.  The CPS worker chose to do so and did.  UMF 80.  The CPS worker gave the keys to Officer Drobish, and Officer Drobish transported plaintiff to the Yolo County Jail.  UMF 81.  Plaintiff was booked into the Yolo County Jail.  UMF 82.

On February 24, 2011, the Probable Cause Declaration prepared by Detective Towle was presented to Judge Fall of the Yolo County Superior Court.  UMF 86.  Officer Tompkins of the Yolo County Jail had completed the bottom portion of the Declaration but for the boxes indicating the Judge's determination, and faxed the declaration to Judge Fall's chambers.  UMF 87.  According to defendants, Judge Fall signed and approved the Probable Cause Declaration confirming that probable cause existed for the arrest.  UMF 88.

Plaintiff disputes that fact, though.  Dckt. No. 45 at 2 (citing Pl.'s Opp'n, Ex 2, Dckt. No. 44 at 27; Decl. Towle, Dckt. No. 43-7 at 1-51).  According to plaintiff, Judge Fall did not make any probable cause determination.  Dckt. No. 44 at 8-10.  Plaintiff challenges the authenticity and value of the probable cause declaration and argues that the word "OK" written by Judge Fall is ambiguous and that the box to check indicating that probable cause was found to exist was left blank.  He also adds that defendants fail to present any evidence that Judge Fall's "OK," date, and signature were made on February 24, 2011.  *Id.* at 8-9.  Plaintiff further argues that the "understandings" of Officer Tompkins cannot justify probable cause.  *Id.* at 8.  Plaintiff contends that Judge Fall could not have found the existence of probable cause because (1) there was no complaint from the victim (account holder Elena Portnoy) and River City Bank is not a victim; and (2) the plain language of 476(a) makes clear that there was no probable cause since plaintiff used available money for an ATM withdrawal.  *Id.* at 9-10.

Plaintiff does not dispute that the Probable Cause Declaration was faxed back to the Yolo County Jail and Officer Tompkins received it.  Officer Tompkins recognized Judge Fall's signature and made copies of it for the Jail's "Transportation File" and the "Court File."  UMF 89.  Officer Tompkins does not complete the boxes in the lower portion of the form because the Declaration is faxed to the judge for review and signature rather than being read to the judge in person.  Officer Tompkins does not know the judge's determination when he faxes the declarations, so he routinely leaves the boxes blank.  UMF 90.

On February 25, 2011, within two days of plaintiff's arrest, he appeared in the Yolo County Superior Court for arraignment.  UMF 91.  After receipt by the jail of the order of release from the court, plaintiff was then released from the Yolo County Jail on his own recognizance.  UMF 92.  Plaintiff's booking, his stay at the jail, including his attendance in court, the duration of his detention and time of his release, was determined not by the City of Woodland, but by the scheduling of the court, the processing and receipt of the order of release by the Yolo County Sheriff's Department and its jail staff, and the availability of jail personnel to effectuate the

1   release.  The City of Woodland and the Woodland Police Department have no hand in or control

2   over Plaintiff's release from Jail.  UMF 93.

3   III.    MOTION FOR SUMMARY JUDGMENT

4          A.  Summary Judgment Standard

5          Summary judgment is appropriate when it is demonstrated that there exists "no genuine

6   dispute as to any  material fact and the movant is entitled to a judgment as a matter of law."  Fed.

7   R. Civ. P. 56(a).  Under summary judgment practice, the moving party

8               always bears the initial responsibility of informing the district
                court of the basis for its motion, and identifying those portions of
9               "the pleadings, depositions, answers to interrogatories, and
                admissions on file, together with the affidavits, if any," which it
10              believes demonstrate the absence of a genuine issue of material
                fact.

11

12  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).[4]

13         Summary judgment avoids unnecessary trials in cases with no genuinely disputed

14  material facts.  *See N.W. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir.

15  1994).  At issue is "whether the evidence presents a sufficient disagreement to require

16  submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

17  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Thus, Rule 56 serves to screen

18  the latter cases from those which actually require resolution of genuine disputes over material

19  facts; e.g., issues that can only be determined through presentation of testimony at trial such as

20  the credibility of conflicting testimony over facts that make a difference in the outcome.

21  *Celotex*, 477 U.S. at 323.

22         Focus on where the burden of proof lies as to the issue in question is crucial to summary

23  judgment procedures.  "[W]here the nonmoving party will bear the burden of proof at trial on a

24

25         [4] Although the court in *Celotex* cites to Federal Rule of Civil Procedure 56(c) for
    the basic summary judgment standard, that standard was moved to Rule 56(a) in the 2010
    amendments to the Rules.  *See* 2010 Amendment notes following Fed. R. Civ. P. 56, effective
26  December 1, 2010.

dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  *Id.*  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *See id.* at 322.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56([a]), is satisfied."  *Id.* at 323.

If the moving party meets its initial responsibility, the opposing party must establish that a genuine issue as to any material fact actually does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To overcome summary judgment, the opposing party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the claim under the governing law, *see Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).  In this regard, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  In attempting to establish the existence of a factual dispute that is genuine, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.

Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587

1 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  However, the

2 opposing party must demonstrate with adequate evidence a genuine issue for trial.

3 *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989).   The opposing party must do

4 so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence

5 presented."  *Anderson*, 477 U.S. at 248, 252.  If the evidence presented could not support a

6 judgment in the opposing party's favor, there is no genuine issue.  *Id.*; *Celotex*, 477 U.S. at 323.

7       In resolving a summary judgment motion, the court examines the pleadings, depositions,

8 answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

9 Civ. P. 56(c).  The evidence of the opposing party is to be believed.  *See Anderson*, 477 U.S. at

10 255.  All reasonable inferences that may be drawn from the facts placed before the court must be

11 drawn in favor of the opposing party.  *See Matsushita*, 475 U.S. at 587.  Nevertheless, inferences

12 are not drawn out of the air, and it is the opposing party's obligation to produce a factual

13 predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F.

14 Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

15 demonstrate a genuine issue, the opposing party "must do more than simply show that there is

16 some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could

17 not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

18 trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

19       B.  Analysis

20              1.  Individual Officers (Detective Towle, Officer Chan, Officer Drobish)

21                   a.  Fifth Amendment

22       The individual officers move for summary judgment on plaintiff's claim that they

23 violated his Fifth Amendment due process rights by arresting and detaining plaintiff and by

24 having CPS remove his children.  Dckt. No. 43-1 at 34-35.  The Fifth Amendment's Due Process

25 Clause applies only to the federal government or federal actions.  *Lee v. City of Los Angeles*, 250

26 F.3d 668, 687 (9th Cir. 2001) ("The Due Process Clause of the Fifth Amendment and the equal

1    protection component thereof apply only to actions of the federal government–not to those of

2    state or local governments."); *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due

3    Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of

4    the Fourteenth Amendment prohibits the States, from depriving any person of property without

5    'due process of law.'").  Here, plaintiff does not allege any federal action and there is no

6    evidence that any of the individual defendants had any connection to the federal government.

7    Therefore, the individual officers are entitled to summary judgment on plaintiff's claim that they

8    violated plaintiff's Fifth Amendment due process rights.[5]

9                                         b.  Fourth Amendment

10        Although the complaint does not clearly delineate what plaintiff's Fourth Amendment

11   claims are, based on the facts alleged, it appears plaintiff alleges claims for improper (I) entry

12   into his home, (ii) arrest, (iii) detention/seizure, and (iv) search.  Dckt. No. 1 at 2-3.  The

13   individual officers argue they are entitled to summary judgment on each of those claims since

14   there is no genuine issue of material fact as to whether they violated any of plaintiff's Fourth

15   Amendment rights.  Dckt. No. 43-1 at 19-32.  They further contend that, even if such a violation

16   occurred, they are entitled to qualified immunity.  *Id.*

17                                         i.  Entry

18                                 (A)  Officers Chan and Drobish

19        Plaintiff alleges that Officers Chan and Drobish acted unlawfully when they entered his

20   home to arrest him.  Pl.'s Decl. at 2.  The Fourth Amendment generally prohibits warrantless

21   entry of a person's home, whether to make an arrest or to conduct a search, unless an exception

22   to the warrant requirement, such as consent, emergency, or exigency, applies.  *Espinoza v. City*

23   *and Cnty. of San Francisco*, 598 F.3d 528, 533 (9th Cir. 2010); *see also Pryor v. City of*

24   *Clearlake*, 2012 WL 2709437 (N.D. Cal. July 6, 2012).  The Fourth Amendment's warrant

25   _____

26        [5]  Plaintiff's Fourteenth Amendment Due Process claim is addressed below.

                                              14

requirement does not apply to an officer's entry into a person's home in situations in which

voluntary consent has been obtained from the individual whose property is searched,

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), or "from a third party who possessed common

authority over or other sufficient relationship to the premises or effects sought to be inspected."

*United States v. Matlock*, 415 U.S. 164, 171 (1974).  The "determination of consent to enter must

be judged against an objective standard . . . ."  *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990);

*see also United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir.1990) (consent to enter the home

is valid if "there was no duress or coercion" and consent is "unequivocal and specific" and

"freely and intelligently given"); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("While

knowledge of the right to refuse consent is one factor to be taken into account, the government

need not establish such knowledge as the sine qua non of an effective consent."); *United States v.*

*Kim*, 25 F.3d 1426, 1431 (9th Cir. 1994) (coercion may be shown if police put defendant into

custody, draw their guns or use other force, or claim authority to enter).

Here, plaintiff does not dispute that he "invited" Officers Chan and Drobish into his

home.  Compl., Dckt. No. 1 at 2; Pl.'s Decl. at 2; Dckt. No. 45.  Therefore, it is undisputed that

those officers had consent to enter plaintiff's home.  Plaintiff does attempt to argue, however,

that the consent was based on a misrepresentation by those officers that they only wanted to ask

plaintiff questions and the consent was therefore invalid.  Dckt. No. 44 at 5-7.  Plaintiff states

that the officers lied to him and contends that if he knew the officers were there to arrest him, he

would not have given them consent to enter.  *Id.*

Contrary to plaintiff's contentions, the consent plaintiff provided to Officers Chan and

Drobish was sufficient to entitle those officers to summary judgment.  In *Schaefers v. Wright*,

1994 WL 163245, at *3-4 (D. Or. Apr. 22, 1994), *aff'd* 46 F.3d 1145 (9th Cir. 1995)

(unpublished), the District of Oregon addressed the specific argument plaintiff advances here

regarding officers' misrepresentations that would allegedly invalidate his consent.  In *Schaefers*,

a police officer knocked on the plaintiff's front door and told him, "I'd like to talk to you for a

15

minute.  May I come in?"  The plaintiff acquiesced, but once inside, the police officer–without a

warrant–arrested the plaintiff for certain crimes.  *Id*. at 4.  Similar to the instant case, the plaintiff

later argued that because the police officer stated that he would like to "talk" to plaintiff, rather

than stating that he would like to "arrest" plaintiff, the police officer misrepresented the true

nature of his visit, and therefore the consent that the plaintiff gave to enter the residence was

void ab initio.  *Id.*

        The court, however, was not persuaded.  Instead, the court relied upon *United States v.*

*Briley*, 726 F.2d 1301 (8th Cir. 1984), which held that it was not a misrepresentation for police

officers to gain entry to a residence by saying that they had "important matters to discuss with

[defendant]," when in fact they intended to arrest him.  726 F.2d at 1304.  The court pointed out

that "[t]he officers had a right to go about their duties 'without gratuitously advertising [their]

every move to anyone [they] might encounter.'"  *Id.* at 1305.  And that, "[t]o adopt Briley's

argument would be to say that the police may never validly arrest a person in his or her home

based on consent unless the officers specifically ask for permission to enter to arrest the suspect

. . . ."  *Id.* at 1305 n.2.  The *Schaefers* court ultimately found that the officers were entitled to

qualified immunity, concluding that the officers' conduct did not violate any clearly established

law requiring the officers to disclose that the purpose for asking permission to enter was to make

the arrest.

        For the same reasons articulated by the *Schaefers* court, this court finds that Officers

Chan and Drobish are also entitled to qualified immunity.  Although the law may not be clearly

settled as to whether, as the District of Oregon suggests in *Schaefers*, the officers request for

permission to enter need not include a disclosure of the intent to arrest the occupant, under the

doctrine of qualified immunity, even if a governmental official violated a constitutional right, he

may be immune from liability if his conduct "does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982).  To determine whether a defendant is entitled to qualified immunity,

courts engage in a two-step inquiry.  The first step is to ask, "[t]aken in the light most favorable

to the party asserting the injury, do the facts alleged show the officer's conduct violated a

constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  If not, the qualified immunity

analysis ends there.  *Id.* at 201.  Assuming, on the other hand, that a violation is established, "the

next sequential step is to ask whether the right was clearly established."  *Id*.  "The relevant

dispositive inquiry in determining whether a right is clearly established is whether it would be

clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

*Saucier*, 533 U.S. at 201.

Here, even when taking the facts in the light most favorable to plaintiff, the facts do not

demonstrate that Officers Chan and Drobish's entry into plaintiff's home – after being invited–

violated plaintiff's Fourth Amendment rights.  And, even assuming that those defendants

violated plaintiff's rights by misrepresenting the purpose of their entry into his home, the law

was not clearly established that the intent to make an arrest of the occupant was a perquisite for

obtaining a valid consent to enter the home.  Because it would not have been clear to a

reasonable officer that such conduct was unlawful in the situation Officers Drobish and Chan

confronted, Officers Chan and Drobish are entitled to summary judgment based on qualified

immunity as to the claim that their entry into plaintiff's home was unlawful.

(B)  Detective Towle

Plaintiff also contends that he did not give Detective Towle permission to enter the home

when he arrived.  Dckt. No. 44 at 5.  Plaintiff specifically disputes UMF 53, which states that

plaintiff did not tell Detective Towle not to enter his home, did not object to Detective Towle

entering his home, and did not ask for Detective Towle to leave.  Dckt. No. 45 at 2.  However,

plaintiff's declaration does not dispute the fact that he did not object to Detective Towle entering

his home.  Plaintiff also does not dispute that he asked to speak with Detective Towle (UMF 46,

50), which would suggest implied consent.  Nor does plaintiff dispute that he was already

handcuffed at the time Towle arrived (UMF 42).  Plaintiff did invite Officers Drobish and Chan

1   into his house, and the fact that Detective Towle, who entered later to assist, was not separately

2   invited inside does not change the lawfulness of the previous seizure and subsequent detention

3   and transportation of the plaintiff.  At the very least, Detective Towle is entitled to qualified

4   immunity because a reasonable officer would have believed that the consent to enter extended to

5   him, given that plaintiff was requesting to speak with him.  *See United States v. Rubio*, 727 F.2d

6   786, 797 (9th Cir. 1983) ("Once consent has been obtained from one with authority to give it,

7   any expectation of privacy has been lost.  We seriously doubt that entry of additional officers

8   would further diminish the consenter's expectation of privacy. . . ").  As such, Detective Towle

9   is entitled to summary judgment on any claim that his entry into plaintiff's home was unlawful.

10                                    ii.  Arrest

11          Plaintiff also claims that the officers unlawfully arrested him without a warrant and

12   without probable cause.  Dckt. No. 1 at 2.  "The Fourth Amendment protects the right of the

13   people to be secure in their persons, houses, papers, and effects, against unreasonable searches

14   and seizures.  In conformity with the rule at common law, a warrantless arrest by a law officer is

15   reasonable under the Fourth Amendment where there is probable cause to believe that a criminal

16   offense has been or is being committed."  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citing

17   *United States v. Watson*, 423 U.S. 411, 417-24 (1976)) (internal quotations omitted).  To prevail

18   on a § 1983 claim for false arrest a plaintiff must demonstrate that there was no probable cause

19   to arrest him.  *Cabrera v. City of Huntington Park*, 139 F.3d 374, 380 (1998).

20          "Probable cause exists when, under the totality of the circumstances known to the

21   arresting officers, a prudent person would have concluded that there was a fair probability that

22   [the defendant] had committed a crime."  *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir.

23   1999) (quoting *United States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992)).  Probable cause does

24   not require overwhelmingly convincing evidence, but only "reasonably trustworthy

25   information."  *Saucier v. Katz*, 533 U.S. 194, 207 (2001).  "Probable cause is an objective

26   standard and the officer's subjective intention in exercising his discretion to arrest is immaterial

1  in judging whether his actions were reasonable for Fourth Amendment purposes." *John v. City*

2  *of El Monte*, 505 F.3d 907, 911 (9th Cir. 2007) (citing *United States v. Lopez*, 482 F.3d 1067,

3  1072 (9th Cir. 2007)).  "It is essential to avoid hindsight analysis, i.e., to consider additional

4  facts that became known only after the arrest was made." *Id*. (citing *Hansen v. Black*, 885 F.2d

5  642, 645 (9th Cir.1989)).  Further, as a general matter, "'an officer need not have probable cause

6  for every element of the offense.'" *Lopez*, 482 F.3d at 1072 (only when specific intent is a

7  required element of the offense must the arresting officer have probable cause for that element in

8  order to reasonably believe that a crime has occurred) (quoting *Gasho v. United States*, 39 F.3d

9  1420, 1428 (9th Cir. 1994)).

10       Here, defendants contend that they had probable cause to arrest plaintiff for violating

11  California Penal Code section 467(a), which provides:

12       Any person who . . . willfully, with intent to defraud, makes or draws or utters or
delivers any check, or draft or order upon any bank or depository, or person, or

13       firm, or corporation for the payment of money, knowing at the time of such
making, drawing uttering or delivering that the maker or drawer or the

14       corporation has not sufficient funds in, or credit with said bank or depository, or
person, or firm, or corporation, for the payment of such check, draft, or order and

15       all other checks, drafts, or orders upon such funds then outstanding in full upon its
presentation, although no express representation is made with reference thereto, is

16       punishable by imprisonment in the county jail for not more than one year, or in
the state prison.

17

18       Defendants argue that because Judge Fall found that there was probable cause for the

19  arrest (the morning after the arrest), they are entitled to summary judgment.  Dckt. No. 43-1 at

20  23.  However, as plaintiff points out, the probable cause declaration that Judge Fall allegedly

21  approved has two problems.[6]  First, although the top half of the affidavit includes an "OK" with

22

23       [6] Although plaintiff speculates that Deputy Tompkins, Detective Towle, and Judge Fall
were all dishonest regarding when Judge Fall's signature was made on the declaration and dated

24  2-24-11, plaintiff has no evidence to dispute the facts as presented by defendants and Officer
Tompkins; he only alleges that it is "absolutely possible" that Deputy Tompkins, Detective

25  Towle and Judge Fall have misrepresented the true sequence of events.  However, "[M]ere . . .
speculation [does] not create a factual dispute for purposes of summary judgment." *Nelson v.*

26  *Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).

1    Judge Fall's signature, it is not entirely clear what is meant by "OK."  Dckt. No. 34-6 at 50.

2    Although the likely meaning is that Judge Fall agreed there was probable cause, it is ambiguous,

3    particularly where there was a specific location on the document to check if probable cause is

4    found to be present and the box was not checked.  Second, the bottom half of the declaration,

5    which was filled out by Deputy Tompkins, indicates that the facts in the declaration were read to

6    Judge Fall at 7:30 a.m. on February 24, 2011, but Deputy Tompkins did not mark the box

7    indicating whether Judge Fall found that there was probable cause.

8        Deputy Tompkins now explains this in his declaration, indicating that at 7:30 a.m. on

9    February 24, 2011, he completed the lower portion of Detective Towle's probable cause

10   declaration but did not check the box indicating whether there was probable cause.  Instead, he

11   faxed the declaration to Judge Fall's chambers, Judge Fall wrote "OK, Timothy Fall, Judge,

12   2/24/11," and faxed it back.  Tompkins Decl. ¶¶ 2-4.  Deputy Tompkins states that he

13   "understood the notation and signature [to mean] that he had found probable cause for the

14   arrest."  *Id.* ¶ 5.  Officer Tompkins also indicated that because the probable cause declarations

15   are faxed rather than actually read to the judge, Deputy Tompkins was unable to mark one of the

16   boxes because he did not know what the judge's determination as to probable cause would be.

17   Therefore, the boxes are routinely left blank.  *Id.* ¶ 6.

18       Despite Deputy Tompkins' testimony, it is unclear whether Judge Fall's "OK" was

19   intended to indicate that he found there was probable cause for the arrest.  Given the ambiguity,

20   the court will not grant summary judgment based on Judge Fall's finding of probable cause

21   alone.  However, regardless of the error, as explained below the officers are entitled to summary

22   judgment because they had probable cause to arrest plaintiff.

23                              (A)  <u>Detective Towle</u>

24       According to the undisputed facts, Detective Towle made the determination that there

25   was probable cause to arrest plaintiff.  Dckt. No. 43-7 at 33.  Plaintiff does not dispute that at the

26   time Detective Towle determined that there was probable cause to arrest plaintiff, Detective

1  Towle knew that a complaint had been made to the Woodland Police Department by the victim,

2  River City Bank, regarding a $6000.00 deficit created by plaintiff's actions.  Detective Towle

3  had evidence that plaintiff had deposited the checks at issue.  The detective had evidence those

4  checks were returned for lack of funds; that it was not the first time plaintiff had deposited

5  checks and then overdrew an account; and that the address on the checks was the same as

6  plaintiff's address although the alleged check writer did not live there.  Detective Towle also had

7  evidence of the 2006 arrest and aborted prosecution of plaintiff on similar charges and conduct.

8  Further, a comparison of the signature from Arutyunova's drivers' license and the signatures on

9  the checks did not lead Detective Towle to be confident that they were done by the same hand.

10  Detective Towle was also unable to locate Arutyunova, the alleged check writer, at any of her

11  potential addresses, nor was he able to find out anything about her, other than according to

12  plaintiff, she was his ex-wife.  Detective Towle also had the report of Officer McKenzie, which

13  documented a conversation with plaintiff prior to his arrest in which he refused to say why

14  Arutyunova owed him the money and stated that Arutyunova could not write English and only

15  spoke broken English, yet the handwriting on the checks was alleged to be Arutyunova's.

16        The only contrary evidence presented by plaintiff is his sworn affidavit, in which he

17  states in a conclusory manner that there was no probable cause.  However, that is merely a

18  statement of a legal conclusion and does not establish a genuine dispute of material fact as to the

19  evidence relied on by Detective Towle for establishing probable cause.  Although plaintiff

20  contends in his original opposition, Dckt. No. 35 at 6, that he could not have written any checks

21  since he did not have a checking account at the time, that assertion does not dispute any of the

22  evidence that Detective Towle had in front of him when concluding that there was probable

23  cause to arrest plaintiff.[7]

24

25        [7] Plaintiff seems to be challenging the fact that the officers did not present *him* with proof
   of probable cause.  However, plaintiff has not provided any authority demonstrating that the law
26  required them to do so.

1    Under these circumstances, a reasonable person could have concluded that there was a

2    fair probability that plaintiff had committed a crime, and more specifically, that he violated

3    California Penal Code section 467(a).  It does not matter that plaintiff was not subsequently

4    charged with that crime.  *See Devenpeck*, 543 U.S. at 152 ("Whether probable cause exists

5    depends on the reasonable conclusion to be drawn from the facts known to the arresting officer

6    at the time of the arrest"); *City of El Monte*, 515 F.3d at 940 ("It is essential to avoid hindsight

7    analysis, i.e., to consider additional facts that became known only after the arrest was made.").

8    Even if the evidence relied on by Detective Towle did not rise to the level of probable

9    cause it is sufficient on this record to entitle him to qualified immunity.  "Where a plaintiff

10   asserts a Fourth Amendment violation based on the absence of probable cause, the relevant

11   inquiry with respect to the clearly established prong of the qualified immunity analysis is

12   whether a reasonable officer could have believed that probable cause existed to arrest the

13   plaintiff."  *Burdett*, 2007 WL 2429426 (citing *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir.2002))

14   (internal quotations omitted).  Thus, "[e]ven law enforcement officials who reasonably but

15   mistakenly conclude that probable cause is present are entitled to immunity." *Burdett*, 2007 WL

16   2429426 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).  "The United States

17   Supreme Court has noted that the qualified immunity standard gives ample room for mistaken

18   judgments by protecting all but the plainly incompetent or those who knowingly violate the

19   law."  *See Peng v. Hu*, 335 F.3d 970, 976 (9th Cir. 2003) (citing *Hunter*, 502 U.S. at 229)

20   (quotations omitted).

21   Undoubtedly, there was a clearly established at the time of the incident in question a right

22   to be free from unreasonable searches and seizures.  However, the inquiry as to qualified

23   immunity must be more focused than that.  *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

24   Rather, the focus must be on whether the law was sufficiently settled such that a reasonable

25   officer would know that his or her conduct in question was unlawful.  Thus, "[t]o be clearly

26   established, 'in the light of pre-existing law the unlawfulness must be apparent.'" *A.D. v.*

1   *California Highway Patrol*, 712 F.3d 446, 455 (9th Cir. 2013) (quoting *Anderson v. Creighton*,

2   483 U.S. at 639).   Given the extensive evidence before the officer here, as outlined above, the

3   situation confronted by Detective Towle presented enough objective circumstances for him to

4   conclude there was sufficient evidence to support probable cause to arrest plaintiff for violating

5   California Penal Code section 467(a).  *See Guice v. City of Fairfield*, 2008 WL 2073965 (E.D.

6   Cal. May 14, 2008); *Sherman v. City of Davis*, 2008 WL 553632 (E.D. Cal. Feb. 26, 2008).

7   Therefore, Detective Towle is entitled to summary judgment on plaintiff's unlawful arrest claim.

8                                  (B)  Officers Chan and Drobish

9          Officers Chan and Drobish are also entitled to summary judgment on plaintiff's unlawful

10  arrest claim.   The undisputed facts show that Officers Chan and Drobish were specifically

11  instructed to locate and arrest plaintiff based on Detective Towle's probable cause declaration.

12  UMF 29, 31, 32.   Law enforcement officers are generally entitled to rely on information obtained

13  from fellow law enforcement officers.  *See Whiteley*, 401 U.S. 560, 568 (1971); *United States v.*

14  *Bernard*, 623 F.2d 551, 560-61 (9th Cir. 1980).   The lead officer is responsible for ensuring that

15  they have lawful authority for their actions. *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022,

16  1027 (9th Cir. 2002), aff'd, 540 U.S. 551 (2004).   "Line officers, on the other hand, are required

17  to do much less." *Id*. at 1028.   "The linchpin is whether the officer's reliance on the information

18  was objectively reasonable."  *Motley v. Parks*, 432 F.3d 1072, 1081-82 (9th Cir. 2005) (citing

19  *United States v. Hensley*, 469 U.S. 221, 232-33 (1985)).   Where an officer has an objectively

20  reasonable, good-faith belief that he is acting pursuant to proper authority, he cannot be held

21  liable if the information supplied by other officers turns out to be erroneous.  *See id* at 232;

22  *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976) ("A facially valid direction from

23  one officer to another . . . insulates the complying officer from assuming personal responsibility

24  or liability for his act done in obedience to the direction.").

25         Here, Officers Drobish and Chan responded to a request by a superior officer (Detective

26  Towle) to find and arrest a suspect (plaintiff) based upon probable cause.   They are therefore

1   entitled to qualified immunity with regard to plaintiff's unlawful arrest claim, as they objectively

2   and reasonably had a good faith belief that they were acting under proper authority, that the

3   arrest was legal, and that it was not in violation of plaintiff's rights.

4                                    iii.  Seizure/Detention

5          Here, plaintiff suggests that his 55 hour detention after being arrested was unlawful.

6   However, plaintiff has not presented any evidence demonstrating whether the 55 hours was

7   unreasonable under the circumstances of his arrest and detention or that there is a valid basis for

8   challenging his detention.  Nor has he disputed defendants' evidence that plaintiff's booking, his

9   stay at the jail, including his attendance in court, the alleged duration of his detention and time of

10  his release, were determined not by the City of Woodland, but by the scheduling of the court, the

11  processing and receipt of the order of release by the Yolo County Sheriff's Department and its

12  jail staff, and the availability of jail personnel to effectuate the release, and the City of Woodland

13  and that the Woodland Police Department have no hand in or control over Plaintiff's release

14  from Jail.  UMF 93; *Swanigan v. Trotter*, 645 F. Supp. 2d 656 (N.D. Ill. 2009) ("Arresting city

15  police officers had no responsibility for arrestee's detention once they brought him to police

16  station's lockup, and thus could not be liable under Section 1983 for any unreasonable detention

17  that occurred after their contact with arrestee ended.").  Therefore, assuming that the 55 hours

18  was excessive, the individual defendants are entitled to summary judgment on plaintiff's

19  unlawful detention claim because they had no control over whatever delay occurred in

20  processing an initial appearance or establishing bail.

21                                    iv.  Search

22         Finally, plaintiff claims that the defendants violated his Fourth Amendment rights by

23  conducting an unlawful search of his home.  However, the only evidence that plaintiff has

24  presented regarding a search are his statements in his declaration that one of the officers

25  "immediately started to search [plaintiff's] house with disregard to [plaintiff's] demand to stop

26  [the] illegal action," Pl.'s Decl. ¶ 9, and that after Detective Towle arrived, he started to walk

                                          24

1   and whisper with the other males all over plaintiff's residence.  *Id.* ¶ 16.  Plaintiff does not

2   provide any further evidence regarding the scope of the search.  Significantly, he does plaintiff

3   dispute UMF 38, which states that Officer Chan conducted a quick protective sweep of the

4   residence to ensure there were no other people present in the house that could potentially be a

5   threat to the officers, or UMF 39, which states that no search for evidence, things, or of

6   plaintiff's belongings was done.

7         Officers are permitted to conduct a protective sweep, which is defined as "a quick and

8   limited search of premises, incident to an arrest and conducted to protect the safety of police

9   officers and others."  *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  The rationale for allowing

10  such a search flows from the Court's decisions in *Terry v. Ohio*, 392 U.S. 1 (1968) and *Michigan*

11  *v. Long*, 463 U.S. 1032 (1983), which allowed for a brief intrusion of personal privacy that was

12  no more than necessary to protect the officer from harm.  *Maryland v. Buie*, 494 U.S. at 333.

13  The protective sweep allows officers to conduct a warrantless cursory inspection of those places

14  where a person may be found, during or after an arrest.  *Id*. at 335.  In order to conduct a

15  protective sweep, "there must be articulable facts which, taken together with the rational

16  inferences from those facts, would warrant a reasonably prudent officer in believing that the area

17  to be swept harbors an individual posing a danger to those on the arrest scene."  *United States v.*

18  *Paopao*, 465 F.3d 404, 410 (9th Cir. 2006) (quoting *Buie*, 494 U.S. at 334).  The record before

19  the court is that the officers made a very limited visual inspection of the premises to determine

20  whether other persons were present and then proceeded to execute the arrest.  Plaintiff has

21  presented no evidence to show that this search conducted by the individual defendants was

22  anything other than a permissible protective sweep.  Accordingly, those defendants are entitled

23  to summary judgment on this claim.

24                    c.  Human Rights Act

25         Defendants move for summary judgment on plaintiff's claim that defendants violated the

26  "Human Rights Act" applicable under United States Law.  Dckt. No. 43-1 at 19.  Plaintiff does

1    not address this claim in his opposition.  *See generally* Dckt. No. 44.  Regardless, no such claim

2    appears to exist under the laws of the United States.  Therefore, defendants are entitled to

3    summary judgment on this claim.

4                                   d.  Assault

5           Defendants move for summary judgment on plaintiff's claim of assault.[8]  Dckt. No. 43-1

6    at 34.  Plaintiff's opposition does not respond to this argument either.  *See generally* Dckt. No.

7    44.  Regardless, there is no evidence to support such a claim.  "A civil action for assault is based

8    upon an invasion of the right of a person to live without being put in fear of personal harm."

9    *Lowry v. Standard Oil Co. of Cal.*, 63 Cal. App. 2d 1, 6–7 (1944).  To establish a claim for

10   assault, a plaintiff must prove that: (1) the defendant acted, intending to cause harmful or

11   offensive contact; (2) the plaintiff reasonably believed that he was about to be touched in a

12   harmful or offensive manner; (3) the plaintiff did not consent to the defendant's conduct; (4) the

13   plaintiff was harmed; and (5) the defendant's conduct was a substantial factor in causing

14   plaintiff's harm.  *See* Judicial Council of Cal. Civ. Jury Instruction 1301 (Fall 2011).  Here, there

15   is no claim or evidence that defendants threatened force or any harmful touching of plaintiff.  *See*

16   *Pryor v. City of Clearlake*, 2012 WL 2709437 (N.D. Cal. July 6, 2012).  Therefore, the

17   individual defendants are entitled to summary judgment on this claim.

18                                   e.  Trespass

19          Defendants move for summary judgment on plaintiff's claim of trespass.  Dckt. No. 43-1

20   at 32.  Again, plaintiff does not respond to this argument in his opposition.  *See generally* Dckt.

21   No. 44.  Regardless, there is no evidence to support such a claim.  "The essence of the cause of

22   action for trespass is an 'unauthorized entry' onto the land of another.  Such invasions are

23   characterized as intentional torts, regardless of the actor's motivation.  Where there is a

24

25          [8] It is important to note that although plaintiff lists "assault" as one of the causes of action
     on the front page of his complaint, he does not address this cause of action anywhere in his
26   complaint.  *See generally* Compl., Dckt. No. 1.

consensual entry, there is no tort, because lack of consent is an element of the [theory underlying the tort]. . . ." *Church of Christ in Hollywood v. Super. Ct.*, 99 Cal. App. 4th 1244, 1252 (2002); *accord Mangini v. Aerojet-Gen. Corp.*, 230 Cal. App. 3d 1125, 1141 (1991); *Civic W. Corp. v. Zila Indus., Inc.*, 66 Cal. App. 3d 1, 16-17 (1977).  As derived from an applicable California jury instruction, the elements of the intentional tort of trespass can be stated as follows: (1) plaintiff owned, leased, occupied, or controlled the property; (2) defendants intentionally, recklessly, or negligently entered plaintiff's property; (3) defendants lacked permission for the entry or exceeded the scope of such permission; (4) plaintiff was actually harmed; and (5) defendants' entry was a substantial factor in causing plaintiffs' harm.  *See* Judicial Council of Cal. Civ. Jury Instruction 2000 (Fall 2011).  As discussed above, plaintiff permitted Officers Chan and Drobish to enter.  And, even if Detective Towle did not have permission to enter, plaintiff has offered no evidence demonstrating that he was harmed by Detective Towle's entry since plaintiff was already in custody by the time Towle arrived.  Therefore, the individual defendants are entitled to summary judgment on this claim.

f. Intentional Infliction of Emotional Distress

Defendants move for summary judgment on plaintiff's claim of intentional infliction of emotional distress.  Dckt. No. 43-1 at 37.  Plaintiff does not respond to this argument in his opposition.  *See generally* Dckt. No. 44.  Nonetheless, plaintiff has presented no evidence to support such a claim.

In California, the elements of an intentional infliction of emotional distress claim are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard for the probability of causing, emotional distress; (2) the severe or extreme emotional distress suffered by that plaintiff; and (3) actual and proximate causation of the emotional distress by defendant's outrageous conduct.  *Corales v. Bennett*, 567 F.3d 554, 571 (9th Cir. 2009) (citations and internal quotations omitted).  Here, as discussed above, defendants' conduct in entering plaintiff's home, arresting and detaining him, and conducting a protective sweep

1    were reasonable as a matter of law.  Accordingly, plaintiff cannot establish that defendants

2    engaged in "extreme and outrageous conduct."  *See Long v. City & Cnty. of Honolulu*, 511 F.3d

3    901, 908 (9th Cir. 2007) (holding that where an officer's actions in fatally shooting a criminal

4    suspect were reasonable as a matter of law, that officer's behavior could not be considered

5    "outrageous" conduct for purposes of the plaintiff's intentional infliction of emotional distress

6    claim).  *See Molieri v. County of Marin*, 2012 WL 1309172 (N.D. Cal. Apr. 16, 2012); *Mejia v.*

7    *City of San Bernardino*, 2012 WL 1079341 (C.D. Cal. Mar. 30, 2012).  Therefore, the individual

8    defendants are entitled to summary judgment on this claim.

9                              g.  Negligent Infliction of Emotional Distress

10          Defendants move for summary judgment on plaintiff's claim of negligent infliction of

11   emotional distress.  Dckt. No. 43-1 at 37-38.  Again, although plaintiff does not respond to this

12   argument in his opposition, Dckt. No. 44, plaintiff has presented no evidence to support such a

13   claim.

14          In California, in order to state a prima facie case of negligent infliction of emotional

15   distress, plaintiff must plead "[t]he traditional elements of duty, breach of duty, causation and

16   damages."  *Fluharty v. Fluharty*, 59 Cal.App.4th 484, 490 (1997).  Where there is a "special

17   relationship," such that there is justified reliance by plaintiff on the defendant's statement or

18   promise, a duty has been found to exist. *Antique Arts Corp. v. City of Torrance*, 39 Cal. App. 3d

19   588, 593 (1974); *see also Morgan v. County of Yuba*, 230 Cal. App. 2d 938 (1964) (deputy

20   sheriff voluntarily promised to warn decedent if defendant, who had made threats on her life,

21   was released; defendant was released, but sheriff did not warn and heirs had cause of action

22   against county).  "A 'special relationship' exists if and only if an injured person demonstrates the

23   public officer 'assumed a duty toward [him] greater than the duty owed to another member of the

24   public.'"  *Strong v. State*, 201 Cal. App. 4th 1439, 1453 (2011) (citations omitted).  Here,

25   plaintiff has offered no evidence suggesting a duty by defendants or a special relationship that

26   would create such a duty.  *See Howard v. Hibshman*, 2012 WL 2524373 (S.D. Cal. June 29,

1    2012); *Garcia ex rel. Garcia v. County of Sacramento*, 2012 WL 1605056 (E.D. Cal. May 7,

2    2012).   Therefore, the individual defendants are entitled to summary judgment on this claim.

3                              h.   Other Potential Claims

4            Plaintiff does not specifically raise any claims other than those discussed above.

5    However, in the exercise of caution, defendants address three additional claims (equal

6    protection, due process, and denial of familial relations).   Plaintiff does not respond to

7    defendants' arguments regarding any of those claims.   Regardless, even if the merits of those

8    claims are considered, defendants would be entitled to summary judgment on each of them, as

9    follows:

10                              i.   Equal Protection Clause

11           To the extent plaintiff purports to establish a claim under § 1983 for violation of

12   plaintiff's rights under the equal protection clause, defendants are entitled to summary judgment

13   on that claim.   The equal protection clause commands that no state shall "deny any person within

14   its jurisdiction the equal protection of the laws."   U.S. CONST. amend. XIV, § 1.   It is not enough

15   to show mere differential treatment; a party must allege and prove the presence of an unlawful

16   intent to discriminate against him for an invalid reason.   *Snowden v. Hughes*, 321 U.S. 1, 8

17   (1944).   Here, plaintiff has failed to provide any evidence demonstrating that he was arrested or

18   detained because of his race or national origin, or for any other invalid reason, or that any of the

19   named defendants acted with any racial animus or discriminatory intent toward plaintiff.

20   Therefore, defendants would be entitled to summary judgment on any equal protection clause

21   claim.   *See Pryor v. City of Clearlake*, 2012 WL 2709437 (N.D. Cal. July 6, 2012).

22                              ii.   Due Process

23           To the extent plaintiff claims the officers' entry into his home, arrest, detention, and/or

24   search violated his right to due process under the Fourteenth Amendment, defendants are entitled

25   to summary judgment.   Any claim under the Fourteenth Amendment is not actionable because

26   plaintiff's allegations of an unconstitutional entry into his home, arrest, detention, and/or search

1    are covered by a more specific provision, the Fourth Amendment.  Indeed, the Supreme Court

2    has stated that, because it has "always been reluctant to expand the concept of substantive due

3    process" under the Fourteenth Amendment, where a particular "[a]mendment provides an

4    explicit textual source of constitutional protection against a particular sort of government

5    behavior, that Amendment, not the more generalized notion of substantive due process" must be

6    the guide for analyzing such claims.  *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998);

7    *see also Pryor*, 2012 WL 2709437; *Buckheit v. Dennis*, 2012 WL 1166077 (N.D. Cal. Apr. 6,

8    2012).  Therefore, the individual defendants are entitled to summary judgment on any due

9    process claim.

10                              iii.  Familial Relations

11           To the extent plaintiff contends that the individual defendants violated his familial rights

12   by putting his children in foster care while he was detained, those defendants would also be

13   entitled to summary judgment.  Courts have recognized that parents have a Fourteenth

14   Amendment liberty interest in the companionship and society of their children.  *Curnow v.*

15   *Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).  Official conduct that "shocks the

16   conscience" in depriving parents of that interest is cognizable as a violation of due process.

17   *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  In determining whether excessive force

18   shocks the conscience, the first inquiry is "whether the circumstances are such that actual

19   deliberation [by the officer] is practical."  *Id.*  "Where actual deliberation is practical, then an

20   officer's 'deliberate indifference' may suffice to shock the conscience.  On the other hand, where

21   a law enforcement officer makes a snap judgment because of an escalating situation, his conduct

22   may only be found to shock the conscience if he acts with a purpose to harm unrelated to

23   legitimate law enforcement objectives."  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

24   Here, since the officers only placed plaintiff's children in foster care for the time that plaintiff

25   was detained because plaintiff had nobody else to care for them, those officers would be entitled

26   ////

to summary judgment on any such claim.  *See Adams v. Albertson*, 2012 WL 440465 (N.D. Cal. Feb. 10, 2012).

       2.  Underline City of Woodland

         a.  42 U.S.C. § 1983 and *Monell*

     Defendant City of Woodland also moves for summary judgment on plaintiff's § 1983 claim.  Dckt. No. 43-1 at 16.  "Local governments are only liable under § 1983 for constitutional torts that amount to a custom or policy."  *Picray v. Sealock*, 138 F.3d 767, 772 (9th Cir. 1998) (citing *Monell*, 436 U.S. at 691).  "Proof of random acts or isolated events does not satisfy the plaintiff's burden to establish a custom or policy."  *Id*. (citing *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443-44 (9th Cir. 1989)).

     A plaintiff can establish municipal liability in one of three ways.  *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992).  "First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a 'longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.'"  *Id*. (quoting *Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701, 737 (1989)).  Second, the plaintiff may show that the individual who committed the constitutional tort was an official with final policy-making authority such that the alleged tort itself constituted an act of official governmental policy.  *Id*. (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)) (internal quotations omitted).  Third, the plaintiff may establish that such an official ratified a subordinate's unconstitutional act.  *Id*. at 1346-47 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-24 (1988) (plurality opinion)).  "After proving that one of the three circumstances existed, a plaintiff must also show that the circumstance was (1) the cause in fact and (2) the proximate cause of the constitutional deprivation."  *Arnold v. Int'l Bus. Mach. Corp*., 637 F.2d 1350, 1355 (9th Cir. 1981); *see also City of Springfield v. Kibbe*, 480 U.S. 257, 266-68, (1987) (discussing causation requirement in section 1983 municipal liability cases)."  *Id.* ////

1        Here, as an initial matter, because the individual officer defendants are entitled to

2   summary judgment on all of plaintiff's claims regarding alleged constitutional violations, there

3   can be no *Monell* liability for the City.  Even assuming some violation of plaintiff's rights by one

4   or more individual officers, plaintiff has pointed to no evidence of an official policy or custom.

5   Nor does he present evidence that any of the officers were policymaking officials, or that the

6   policymakers ratified an unconstitutional act.  *See Christie v. Iopa*, 176 F.3d 1231, 1237 (9th Cir.

7   1999) (citing *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996) ("The police officers who shot

8   Bahena were not 'officials with final policy-making authority' and they were not ordered to

9   shoot by the police chief, the City Council or anyone else possessing final policy-making

10  authority"); *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 882-83, 890 (9th Cir.

11  1990) (stating a similar proposition)).  He also has not presented any evidence that an official

12  with policymaking authority ratified a subordinate's unconstitutional act.  Such a complete

13  failure of proof renders all other facts immaterial, and entitles the City of Woodland to summary

14  judgment on plaintiff's § 1983 claims.[9]  *Celotex*, 477 U.S. at 322; *see also Guice v. City of

15  Fairfield*, 2008 WL 2073965 (E.D. Cal. May 14, 2008); *Gutierrez v. Solano*, 2012 WL 123540

16  (C.D. Cal. Jan. 17, 2012); *Pryor*, 2012 WL 2709437.

17                    b.  State Law Claims and California Government Code Section 815

18       The City of Woodland also moves for summary judgment on plaintiff's state law claims.

19  ////

20

21       [9] Plaintiff appears to allege a conspiracy among the City of Woodland police officers, the
22  Yolo County District Attorney's Office, and the Superior Court Bench, and that this alleged
    conspiracy is part and parcel of unlawful practices of the City of Woodland Police Department
23  and the result of the City of Woodland's failure to train its officers.  Plaintiff proceeds to
    compare his 2006 arrest and prosecution with the arrest in this case.  As in this case, plaintiff
24  sued the City of Woodland Police Department in federal court for violation of his Fourth
    Amendment rights related to the 2006 arrest.  Plaintiff's complaint failed in the district court, as
25  well as on appeal to the Ninth Circuit.  Because the prosecution of the 2006 case was terminated,
    plaintiff's subsequent arrest in 2011 for similar charges is not made invalid, nor is it evidence of
26  lack of training of officers, nor evidence of any conspiracy between law enforcement, the
    District Attorney's Office and the Superior Court Bench.

1   Plaintiff does not respond to the City's motion as to those claims or the City's argument that it is

2   immune under California Government Code section 815, which provides that "Except as

3   otherwise provided by statute . . . [a] public entity is not liable for an injury . . . ." *See Molieri v.*

4   *County of Marin*, 2012 WL 1309172, at *6 (N.D. Cal. Apr. 16, 2012).  Nor has plaintiff cited to

5   any statute that would create such liability against the City of Woodland.  Further, although the

6   City of Woodland could be vicariously liable for the actions of its employees if it determined

7   that plaintiff was injured and his injuries were proximately caused by the employee(s) acting

8   within the scope of their employment, because all of the state law claims fail, the City cannot be

9   liable for those claims.  Accordingly, the City of Woodland is entitled to summary judgment on

10  all of plaintiff's state law claims.

11  IV.   <u>FINDINGS AND RECOMMENDATIONS</u>

12         Accordingly, it is hereby RECOMMENDED that:

13         1.  Defendants' motion for summary judgment, Dckt. No. 43, be granted; and

14         2.  The Clerk be directed to enter judgment in favor of defendants and close this case.

15         These findings and recommendations are submitted to the United States District Judge

16  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

17  after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

20  within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

21  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

22  DATED:  May 16, 2013.

                                    EDMUND F. BRENNAN
                                    UNITED STATES MAGISTRATE JUDGE

23

24

25

26